In re Michael Todd BRADLEY and Vicki D. Bradley, Debtors.

No. 5:01–bk–81522.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 21, 2002.

Charles W. Baker, Rose Law Firm, Little Rock, AR, for Debtors.

Thomas S. Streetman, Streetman & Meeks, Crossett, AR, for Renee S. Williams, Chapter 7 Trustee.

## ORDER

ROBERT F. FUSSELL, Bankruptcy Judge.

Pending before the Court are the objection to exemptions and objection to amended exemptions filed by Renee S. Williams ("Trustee"), the duly appointed Chapter 7 trustee, on December 11, 2001, and January 15, 2002, respectively. The Court conducted a hearing on the Trustee's objections on May 21, 2002. For the reasons set forth herein, the Court sustains in part and overrules in part the Trustee's objections to exemptions and objections to

amended exemptions, as discussed in further detail in this opinion.

## I. JURISDICTION

The Court has jurisdiction to enter a final judgment in this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B). The following opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. PROCEDURAL HISTORY

Debtors Michael Todd Bradley and Vicki D. Bradley filed a skeletal voluntary petition for relief under Chapter 7 of the Bankruptcy Code on October 4, 2001. Debtors' schedules, statements, and all remaining documents were filed on October 19, 2001. Claimed as a homestead on Debtors' Schedule C, Property Claimed as Exempt, was real property located in the Har–Ber Meadows subdivision in Springdale, Arkansas (the "Har–Ber Meadows property"). The Har–Ber Meadows property was described in Debtors' Schedule C as 6272 Wells Circle, Springdale, Arkansas, and the current market value was listed as $480,000.00. Debtors' original Schedule C did not set forth the acreage of the Har–Ber Meadows property.

The Trustee filed objections to Debtors' claims of exemptions on December 11, 2001. In her objections, the Trustee argued that the purchase of the Har–Ber Meadows property was facilitated by numerous transfers made with the intent to hinder, delay, or defraud creditors; that the Har–Ber Meadows property is 1.9 acres in area and thus in excess of the Arkansas homestead exemption; and that Debtors should not be allowed to "carve out" a one quarter acre homestead from the Har–Ber Meadows property because the property is subject to restrictive covenants. Debtors responded on December 31, 2001. They admitted that the transfers were made, but denied that they were made with the intent to hinder, delay, or defraud creditors. They also admitted that the Har–Ber Meadows property exceeds the Arkansas homestead exemption, but stated that they were in the process of obtaining a survey to "carve out" one quarter acre.

On January 11, 2002, Debtors filed amended schedules. The amended schedules included an "Attachment A," which divided the Har–Ber Meadows property into two tracts. Tract "A" consisted of a one quarter acre carve out and was listed on Debtors' amended Schedule C as ".25 acres ... located at 6272 Wells Circle, Springdale, AR 72762." The current market value of the carve out was listed as $477,500.00. Tract "B" consisted of the Har–Ber Meadows property minus the one quarter acre carve out. The value of Tract "B" was listed as $2500.00.

The Trustee filed objections to Debtors' amended claim of exemptions on January 15, 2002. The Trustee's objections to amended exemptions re-stated the arguments set forth in her December 11, 2001, pleading, and also argued that Debtors acted arbitrarily, capriciously, and unreasonably in attempting to carve out the one quarter acre tract. Debtors responded on January 17, 2002, restating their previous response, and denying they acted arbitrarily, capriciously, and unreasonably in attempting to carve out the one quarter acre tract.

An evidentiary hearing on the pending objections to exemptions and objections to amended claim of exemptions was conducted on May 21, 2002, at the conclusion of which the Court took the matter under advisement.

## III. FINDINGS OF FACT

In July 1997, Debtor Michael Todd Bradley purchased the flatbed truck division of his former employer, J.B. Hunt, and formed Charger, Incorporated, an entity that eventually was liquidated in a chapter 7 bankruptcy case. In order to finance the $45 million purchase, Bradley borrowed $40 million from Associates, a lending institution in Dallas, Texas. Bradley personally guaranteed the $40 million loan. In addition, Bradley personally borrowed $5 million from FIS, Incorporated (J.B. Hunt).

In July 1998, Charger was experiencing financial difficulties, which caused Bradley to obtain a $1.5 million credit line increase on his $5 million loan. By December 1999, due to the continuing poor financial condition of Charger, Bradley was engaged in efforts with Associates, Mercedes Benz, and FIS Inc., to reorganize the debt structure of Charger. On about December 15, 1999, Bradley's efforts to reorganize Charger's debt structure failed. Charger filed a voluntary petition under chapter 7 of the bankruptcy code on December 28, 1999.

Bradley, who had been the sole shareholder and president of Charger since its inception, was unemployed from the time Charger filed bankruptcy until he began working for Cantrell Waind, a real estate business in Fayetteville, Arkansas, in September 2000. During the time Charger was experiencing financial difficulties, Bradley made a number of transfers that have become the subject of controversy in this matter. In 1998, Bradley sold a herd of calves for $14,354.00. He testified that this transfer was not unusual, in that he sold his calf herd every year. In 1999, Bradley sold his entire remaining herd of cattle for $20,384.00. Bradley testified that he sold the cattle because he had net operating losses that year, and any income generated from the sale would be applied toward those losses and not taxed. In January 2000, Bradley liquidated a 401(k) plan from which he netted $84,459.54. Bradley also liquidated a horse trailer in March 2000 for $3500.00 and a rent house in Fayetteville, Arkansas for $106,000, from which he netted $51,510.00. Also in March 2000, Bradley sold three horses at a total price of $3750.00. In April 2000, Bradley sold a four wheeler for $700.00. Finally, Bradley testified that at some point he liquidated a Merrill Lynch security account worth approximately $5000.00. According to Bradley's testimony, which the Court credits, none of the sales set forth above were to a relative or business associate of Bradley or his wife. None of the transactions or funds have been hidden, and all the sales were public. Bradley testified that he deposited the funds in his checking account and used the funds to live on, to pay off a mortgage on a residence in West Fork, Arkansas, and to partially fund the purchase of the Har–Ber Meadows property.

The Trustee testified that she reviewed Debtors' records and had no reason to believe any of the transfers were to insiders. She did not object to any of the sales of property that occurred pre-petition, and stated that all of the sales appear to have been for fair consideration. The Trustee also testified that Debtors had records of all their transactions and gave her all the information she requested.

Prior to purchasing the Har–Ber Meadows property, Debtors resided on 250 acres in West Fork, Arkansas, in a four bedroom, three and a half bath, two-story home that Debtors contracted to have built in 1994. Debtors lived on the West Fork property from 1994 until its sale on August 7, 2000. Included in the sale of the West Fork property were furniture and certain other items of personal property. The

gross sale price of the West Fork property and personal property was $542,549.85, and the net to Bradley and his wife was $433,630.96.

On August 10, 2000, Bradley purchased the Har–Ber Meadows property. Bradley used the sale proceeds from the West Fork property to partially cover the $480,000.00 purchase price of the Har–Ber Meadows property. The difference in the purchase price was drawn from Bradley's checking account, which was funded by the various liquidations set forth above.

The Har–Ber Meadows property is located in the Har–Ber Meadows subdivision in Springdale, Arkansas. Har–Ber Meadows is a planned unit development, or PUD. A PUD is a zoned classification whereby the city and the developer enter into an agreement that requires the developer to submit a preliminary plat for the entire piece of property that details how the property will be developed. As each phase of the development is completed, a final plat is filed and lots are sold.

Ken Childress, president of the Har–Ber Meadows development, testified that the Har–Ber Meadows subdivision consists of seven such phases, and contains condominiums, single family homes, two story homes, patio homes, rear alley homes, side garage homes, and "estate homes." Estate homes are built on "estate lots" in an area separate from the remainder of the subdivision referred to as "Phase VII." The Har–Ber Meadows property is an estate home, and is located in Phase VII of the subdivision.

The term "estate lot" is defined in the "Declaration of Covenants, Conditions and Restrictions for Har–Ber Meadows Planned Unit Development," (the "Covenants") which was filed in Washington County, Arkansas on June 9, 1997, and introduced into evidence at the evidentiary hearing as Plaintiff's Exhibit "8." "Estate lot" is defined as follows:

"Estate Lot" shall mean and refer to Lots shown on any recorded Plat of the Development as being an Estate Lot on which there is intended to be constructed a single family residence.

The estate homes within Phase VII are governed by certain covenants, restrictions, and building guidelines. Specifically, the Covenants provide that:

*Section 8. No Lot Split.* No Lot shall be split, divided or replatted without the express written approval of Declarent or the ARC [Architectural Review Committee].

Plaintiff also introduced into evidence an excerpt from the Har–Ber Meadows Builder's Guide that contained the building setback requirements applicable to the Har–Ber Meadows property. The setback requirements are as follows:

| | |
|---|---|
| Lot Width: | 150' |
| Min. Lot Area: | 30,000 sf |
| Front Setback: | 33' to ground floor living area/20' to porch |
| Rear Setback: | varies |
| Interior Side Setback: | 20' |
| Street Side Setback: | 25' to ground floor living area/20' to porch |
| Garage line: | 25' to rear property (or floodplain limit, whichever is greater.). |

The Covenants provide for deviations from the various architectural controls as follows:

*Section 6. Deviations.* Declarant, or the person or entity to whom it delegates such authority (i.e. ARC), at its sole discretion, is hereby permitted to approve deviations in these restrictions on building area, location of improvements and building materials in instances where in its judgment, such deviation will not adversely affect the development of the Property as a whole. Such approvals must be granted in writing and when given will automatically

amend these restrictions for that Lot or Commercial Unit only.

In addition, the Covenants provide for variances as follows:

*Section 6. Variances.* The ARC may recommend to the Board, and the Board may, by the vote or written consent of a majority of the members thereof, allow reasonable variances as to the covenants, conditions or restrictions contained in Article IX of this Declaration under the jurisdiction of ARC pursuant to this Article VI, on such terms and conditions as it shall require; provided, however, that all such variances shall be in keeping with the general plan for the improvement and development of the Property.

Finally, the Covenants provide that property may be de-annexed from the subdivision as follows:

*Section 9. Deannexation.*

(a) Land or lands may be deannexed from the Property with the consent of two-thirds (2/3) of each class of members and the approval of the Owner(s) of the land to be deannexed.

(b) Notwithstanding anything contained in Subparagraph (a) above, or any other provision herein, Declarant, its successors or assigns, shall have the right, without the consent of any other Owners or any First Mortgagee, to de-annex land from the scheme of the Declaration if the Owner of the land is agreeable to the deannexation and if the deannexation would benefit the general development process or general development plan.

(c) The deannexations authorized under this Section shall be filed of record.

Mr. Childress testified that neither Debtors or the Trustee have sought any deviations, variances, or deannexation with regard to the Har–Ber Meadows property.

In addition to the Covenants, the Har–Ber Meadows property is subject to various zoning requirements imposed by the city of Springdale. Patsy Christie, Planning and Community Development Director for the city of Springdale, testified at the evidentiary hearing that the Har–Ber Meadows property was platted as a single family residential plat, which means that under zoning regulations the property would have to be re-platted in order to be subdivided into more than one lot. Christie also testified that the property would not be re-platted if such a request were made, because it is located in an area that is platted for single family residential lots. Christie testified that no other residence or commercial structure could be constructed on the Har–Ber Meadows property. Finally, Christie testified that in her opinion no variances from the zoning requirements imposed on the Har–Ber Meadows property are possible because of Article 3, § 24(D) of the Springdale City Code, which states as follows (with regard to planned unit developments such as Har–Ber Meadows):

(D) Waiver or variances not permitted. Once the final plan and plat have been approved, the board of adjustment will not have jurisdiction over variances of lot sizes, bulk or area regulations, and variance or waivers thereof will not be permitted.

Based upon the Court's review of the Springdale zoning regulations, the Court credits Christie's testimony at the evidentiary hearing that the only way to detach the Har–Ber Meadows property from the zoning requirements would be to de-annex it from the subdivision and seek to have it re-zoned. There has been no attempt by any of the parties to instigate a deannexation.

Bradley testified that at the time he purchased the Har–Ber Meadows property

he was aware that it contained more than one quarter acre, and that he could only claim one quarter acre as exempt. In addition, he testified that he was aware that the property was governed by certain covenants, of which he received a copy upon closing on the property.

Bradley testified that he conferred with Jill Jacoway, his former bankruptcy attorney, before he sold the residence and land in West Fork and purchased the Har–Ber Meadows property. Bradley first met with Jacoway in December 1999 and discussed the possibility of bankruptcies for both he and his wife personally, and for Charger. Bradley testified that he received advice from Jacoway regarding the differences in federal and state exemptions, and specifically was advised that the Arkansas Constitution entitles a debtor to an exemption of 80 acres in a rural homestead or one quarter acre in an urban homestead without regard to value. Jacoway's testimony regarding her initial meeting with Bradley was consistent with Bradley's recollections.

Jacoway and Bradley both testified that Bradley was reluctant to file an individual bankruptcy, and that bankruptcy did not become an option until Jacoway became concerned about the Bradleys' tax situation. As set forth earlier in this opinion, Bradley was personally liable by virtue of guarantees on a number of debts of Charger, and Bradley also incurred debt in his own name when forming Charger. Bradley came to believe that those creditors would write off his debts to them and not pursue collection efforts. Jacoway became concerned about the tax consequences of the potential cancellation of debt by Bradley's creditors and testified that her initial advice was to file bankruptcy "right away," so as to ensure that the cancellation of debt would not occur prior to bankruptcy and expose Debtors to a taxable event.

After consulting with a bankruptcy tax expert, Jacoway believed that the cancellation of debts upon which Bradley was not the primary obligor would not result in tax liability. However, the cancellation of the approximately $5 million debt to FIS, Inc. would constitute a taxable event. Jacoway also testified that she was initially advised by her bankruptcy tax expert that the cancellation of debt results in taxable income, but only to the extent the taxpayer is solvent. She was advised that a homestead is exempt from the solvency calculations. The practical effect is that funds channeled into a homestead prior to cancellation of debt are not taxed. Bradley testified that Debtors converted his non-exempt assets into Debtors' homestead to avoid tax liability.

A little more than a year after receiving her initial tax advice, Jacoway received a letter from her bankruptcy tax expert in which he advised her that he had revised his thinking. Specifically, he advised Jacoway that he had just read a case in which exempt property, such as a homestead, was included in calculating whether the taxpayer was solvent. The practical result of that ruling, to the extent it was applicable to Debtors' bankruptcy case, was that Debtors' homestead was no longer insulated from taxes resulting from cancellation of debt. Accordingly, Jacoway determined that Debtors would be liable for taxes on the $480,000.00 value of the home unless they filed bankruptcy before any cancellation of debt occurred.

Jacoway filed a voluntary petition for relief on behalf of Debtors under chapter 7 of the bankruptcy code on October 4, 2001. The petition was a "skeletal" petition, and Jacoway prepared and filed schedules on behalf of Debtors on October 19, 2001. Debtors' original Schedule C, Property Claimed as Exempt, listed the Har–Ber Meadows property by street address only,

and did not set forth the acreage of the property. Jacoway testified that it was "totally [her] fault" that the original schedules did not list the acreage of the Har–Ber Meadows property. According to Jacoway's testimony, which the Court credits, she forgot that Debtors had purchased more than one quarter acre. She did not recall that the purchase exceeded one quarter acre until Debtors' first meeting of creditors, when the Trustee asked Debtors about the size of the lot. Jacoway testified that she realized her error, but was not able to amend Debtors' Schedule C before the Trustee filed her original objections to exemptions.

Jacoway testified that upon realizing Debtors' lot exceeded a quarter acre, she advised Debtors to obtain a survey carving out a one quarter acre homestead from the Har–Ber Meadows property. She also advised Debtors that the survey should not be capricious in carving out an odd shape. The survey creating the one quarter acre carve out was prepared by Frank W. Blew, a professional land surveyor. Jacoway used the Blew survey to prepare amended schedules.

Debtors' amended Schedule C listed a "carved out" one quarter acre as exempt, and assigned a value to the property of $477,500.00. Bradley also listed the remaining portion of the property as "Tract B," and assigned a value of $2,500.00, which he testified that he "pulled out of the air."

The carve out of one quarter acre had a number of interesting consequences for the Har–Ber Meadows property. Specifically, Bradley testified that Debtors would no longer own the sidewalk that goes to the front door of the house, the driveway that runs in front of the house, or the property upon which their mail box was located. Blew testified that the distance from Debtors' house to the south boundary line of the carve out is two feet, leaving Debtors with a two foot front yard. The back part of the lot is accessible by a 10 foot wide area between the west side of Debtors' home and the west boundary of the entire lot.

## IV. CONCLUSIONS OF LAW

### A. FRAUDULENT TRANSFER OF NON–EXEMPT ASSETS

 The first issue the Court will address is whether Debtors' homestead exemption should be denied because they transferred non-exempt assets into the claimed homestead property with the intent to hinder, delay, and defraud their creditors. It is lawful for debtors to convert non-exempt assets into exempt assets, even if the transfers are made on the eve of bankruptcy. *In re Holt*, 84 B.R. 991, 1007–08 (Bankr.W.D.Ark.), *aff'd* 97 B.R. 997 (W.D.Ark.1988), *aff'd* 894 F.2d 1005, 1008 (8th Cir.1990). In fact, Congress contemplated such conversions:

> As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors and permits the debtor to make full use of the exemptions to which he is entitled under the law.

*Id.* at 1008 (quoting H.R.Rep. No. 595, 95th Cong. 1st Sess. 361 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 6317. S.Rep. No. 95–989, 95th Cong.2d Sess. 76 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5862.) However, conversions of non-exempt assets into exempt assets are not without limitations. "The conversion of assets must not be done with the intent to conceal, hinder, delay or defraud creditors." *Id.; see also In re Hogan*, 214 B.R. 882, 884 (Bankr.E.D.Ark.1997).

In this case, Debtors filed their bankruptcy petition on October 4, 2001. Prior to that date, Debtors made the following transfers with regard to non-exempt property:

1. Sold two herds of cattle, one in 1998 for $14,354.00, and one in 1999 for $20,384.00.
2. Liquidated a 401(k)plan at Charger, Inc. in January 2000, netting $84,459.54.
3. Sold a horse trailer and three horses in March 2000 for $7250.00.
4. Sold a rent house located in Fayetteville in March 2000, netting $51,510.00
5. Sold a 4–wheeler in April 2000 for $700.00.
6. Sold their residence located on 250 acres in West Fork in August 2000, netting $433,630.96.
7. Sold farm equipment and personal furniture in August 2000 for $13,950.00.
8. Liquidated a Merrill Lynch Security Account worth about $5000.00, date unknown.

Bradley testified that the proceeds from these transfers of non-exempt assets went into their personal checking account and were used for living expenses and to purchase the Har–Ber Meadows property, which was purchased in August 2000 for $480,000.00.

The Trustee has challenged Debtors' conversion of the listed property on the grounds that the transfers were made with the intent to hinder, delay, or defraud

Debtors' creditors. The Trustee did not allege a violation of 11 U.S.C. § 548, which is the code section that deals with fraudulent conveyances.[1] Rather, the Trustee relies on Debtors' alleged fraudulent behavior to allow the Court to deny Debtors' claim of a homestead exemption in the subject property.

■ Fraud can rarely be demonstrated by direct evidence. Therefore, courts generally look to certain "badges of fraud" to make the determination of whether fraudulent intent exists. Federal law and Arkansas law use the same factors:

1. Whether the transfer was to an insider;
2. Whether the debtor retained possession or control of the property transferred after the transfer;
3. Whether the transfer was concealed;
4. Whether before the transfer occurred, the debtor had been sued or threatened with suit;
5. Whether the transfer was of substantially all of the debtor's assets;
6. Whether the debtor absconded;
7. Whether the debtor concealed other assets;
8. Whether the value received for the transfer was not reasonably equivalent to the value of the asset transferred;
9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made; and

---

1. 11 U.S.C. § 548 states, in relevant part:
(a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted....
All of the alleged fraudulent transfers in this case occurred more than one year prior to the filing of Debtors' bankruptcy petition. Therefore, § 548 is not applicable in this case.

10. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

*Hogan,* 214 B.R. at 885. In this case, the only badges of fraud that are evident are that the transfers were of substantially all of Debtors' assets, and that Debtors were insolvent at the time the transfers were made.

The Trustee testified that she conducted her own independent investigation of Debtors' financial affairs, and that Debtors gave her every record that she requested. She did not object to any of the sales, and was not aware of any transfers to insiders. She testified that every transaction appeared to be appropriately documented. The Trustee presented no evidence that Debtors retained possession or control of the property transferred. All of the transfers appeared to be open and public, and the Trustee testified that the sale of the West Fork property appeared to be for fair consideration. There was no evidence that Debtors were sued or threatened with suit, absconded, or concealed other assets; or that the value received for any asset was not reasonably equivalent to the value of the asset transferred. Further, all of the transfers occurred more than a year prior to filing bankruptcy, and there was no evidence that the transfers occurred shortly before or after a substantial debt was incurred by Debtors. In fact, no evidence has been presented to the Court that Debtors converted non-exempt assets into exempt assets with the intent to hinder, delay, or defraud creditors under the Bankruptcy Code. The only evidence presented regarding the conversion of non-exempt assets related to Debtors' potential tax liability upon the forgiveness of certain debt.

The Court credits Michael Bradley's testimony that he converted his assets to exempt property to avoid paying taxes on potential cancellation of debt income. Accordingly, the Court finds that Debtors did not convert non-exempt assets into exempt assets with the intent to hinder, delay, or defraud their creditors, and Debtors' conversion of non-exempt assets to exempt assets as it relates to Debtors' bankruptcy was permissible.

## B. QUARTER OF AN ACRE HOMESTEAD

The next issue the Court will address is whether Debtors are entitled to carve out and claim one quarter acre of their real property as a homestead when that entire 1.98 acre property is subject to covenants and zoning requirements that prevent the subdivision of the property. In order to decide this issue, the Court must address four subissues:

1. Whether the subject property is property of the bankruptcy estate.

2. If so, whether Debtors are only entitled to $2500.00 from the sale proceeds of the subject property because they knowingly purchased an urban homestead that exceeded $2500.00 in value and one quarter acre in size, or whether Debtors can carve out a one quarter acre homestead from the subject property.

3. Whether Debtors have acted arbitrarily, capriciously, and unreasonably in attempting to carve out a one quarter acre homestead to the injury of the creditors of this estate.

4. If not, whether the Court can order the sale of the remaining non-exempt property, or the sale of the entire property and distribute the proceeds of the to the Trustee and Debtors according to their respective interests in the property.

## 1. PROPERTY OF THE ESTATE

Neither of the parties disagree that the subject property is property of Debtors' estate as of the filing the bankruptcy petition. According to the legislative history relating to § 522, " '[a]fter the property comes into the estate, then the debtor is permitted to exempt it under proposed 11 U.S.C. § 522, and the court will have jurisdiction to determine what property may be exempted and what remains as property of the estate.' " *Tignor v. Parkinson*, 729 F.2d 977, 980 (4th Cir.1984) (quoting 1978 U.S.Code Cong. & Admin. News 5787, 5868, and 6324); *accord Taylor v. Freeland & Kronz*, 503 U.S. 638, 642, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) ("When a debtor files a bankruptcy petition, all of his property becomes property of a bankruptcy estate."). The Court finds that the subject property is property of Debtors' bankruptcy estate.

## 2. HOMESTEAD EXEMPTION

Debtors elected to exempt their personal and real property, including their homestead, pursuant to § 522(b)(2) and Arkansas law.[2] The Arkansas Code enumerates the bankruptcy exemptions available to Arkansas debtors. Ark.Code Ann. § 16–66–218 (Supp.2001). Section 16–66–218(a)

provides exemptions that are available only to debtors in bankruptcy, and are not relevant to this case. Section 16–66–218(b) lists the exemptions that are available to debtors by referencing the Arkansas Constitution, Arkansas statutes, and other exemptions. At issue in this case is the homestead exemption provided by the Arkansas Constitution:

> The homestead in any city, town or village, owned and occupied as a residence, shall consist of not exceeding one acre of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of two thousand five hundred dollars, and in no event shall such homestead be reduced to less than one-quarter of an acre of land, without regard to value.

Ark. Const., art. 9, § 5.

The Trustee argues that because Debtors knew that the subject property contained more than one quarter acre when they purchased the property, and also knew that they would only be entitled to claim one quarter acre as an exempt homestead without regard to value, by purchasing the entire 1.98 acre lot Debtors limited their homestead exemption to $2500.00. Arkansas case law does not sup-

---

**2.** The Bankruptcy Reform Act of 1978 established a method by which individual states could "opt-out" of the federal exemptions and provide bankruptcy exemptions for its citizens pursuant to applicable state law. In 1981, the Arkansas Legislature elected to "opt-out" of the federal exemption scheme. *See* Ark. Code Ann. §§ 16–66–217 and –218 (Supp. 2001). The Arkansas statute provides that "[r]esidents of this state having the right to claim exemptions in a bankruptcy proceeding pursuant to 11 U.S.C. § 522 shall have the right to elect either: (i) The property exemptions provided by the Constitution and the laws of the State of Arkansas; or (ii) The property exemptions provided by 11 U.S.C. § 522(d)." Ark.Code Ann. § 16–66–217 (Supp.2001).

11 U.S.C. § 522(b)(2) states, in relevant part,
(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection.... Such property is—
(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition....

port this premise. If a homestead exceeds $2500.00 in value, the debtors may claim it as a homestead only by showing that its area does not exceed one quarter acre. *Barnhart v. Gorman*, 131 Ark. 116, 198 S.W. 880, 881 (1917). In this case, Debtors have carved out one quarter acre of the 1.98 acre tract and claimed that one quarter acre as exempt property. Even if the property were ordered to be sold, Debtors would be entitled to select a homestead within the constitutional limits. *Rowe v. Gose*, 240 Ark. 722, 401 S.W.2d 745, 746 (1966). According to the Arkansas Supreme Court, "[e]ven if the lot (admittedly worth more than $2,500) exceeds a quarter of an acre in area, it does not follow that the homestead exemption is wholly unavailable. *The owners are in any event entitled to select a tract not exceeding the constitutional minimum of a quarter of an acre.*" *Id.* (emphasis added).

### 3. CARVE OUT OF ONE QUARTER ACRE

■ Beginning in 1896, the Arkansas Supreme Court has been consistent in its holding that a debtor may not select a homestead that is laid out in an arbitrary, capricious, and unreasonable shape, to the injury of the debtor's creditors. *See Sparks v. Day*, 61 Ark. 570, 33 S.W. 1073, 1074 (1896). In *Sparks*, the homestead that was selected "almost surrounds the residue, cutting it off from access to any street, and leaving only an outlet of 62 feet on an alley on the west thereof." *Id.* The *Sparks* court quoted with approval an Alabama court case:

> "An inspection of the remarkable diagram of the homestead attempted to be selected in this case, running, as its boundaries do, in a zigzag direction, and shifting towards every possible point of the compass, shapeless in its capricious irregularity, and without apparent design except to take unjust advantage, ... is the surest demonstration that such a thing cannot be tolerated by the law."

*Id.* (quoting *Jaffrey v. McGough*, 88 Ala. 648, 7 So. 333 (Ala.1890)).

In this case, Debtors hired Frank Blew, a professional land surveyor, to lay out one quarter acre around Debtors' home and driveways for access to the home in any way possible. Blew testified that after establishing the home on the property, and applying the necessary existing setbacks normally used in his business, the property exceeded one quarter acre. He then reduced the dimensions until he had defined the one quarter acre, which includes the driveway. The one quarter acre includes two feet of property in front of the house, two feet on the southwest side of the house, 20 feet on the northwest side of the house, and 30 feet on the northeast side of the house. Blew also testified that there was approximately 10 feet remaining between the proposed exempt property and the west boundary of the subject property, which is as wide as the existing driveway.

The Trustee's argument appears to be based on the fact that the lot apparently cannot be divided without violating Har–Ber Meadows covenants and the City of Springdale zoning ordinances. The Trustee did not introduce an alternative plat. Rather, she merely states that the homestead exemption claimed by Debtors is arbitrary, capricious, and unreasonable. The Court disagrees. The Court finds that Debtors are entitled under the Arkansas constitution to carve out one quarter acre from the subject property, and that the proposed homestead exemption proffered by Debtors is not arbitrary, capricious, or unreasonable in the light of the allowed exemption.

4. SALE OF THE SUBJECT PROPER-
TY

██ Finally, the Trustee argues that because the subject property cannot be subdivided according to the existing Har–Ber Meadows covenants and City of Springdale ordinances, the Court should order the Trustee to sell the Har–Ber Meadows property and turn over to Debtors the value of their homestead exemption. In support of her position, the Trustee cites to several cases in which courts have ordered the trustee to sell the property. None of the cases cited by the Trustee deal with the Arkansas constitutional right to a homestead exemption.

The only Eighth Circuit case cited by either party is *O'Brien v. Heggen,* 705 F.2d 1001 (8th Cir.1983). In *O'Brien,* the court recognized that under Minnesota law an urban homestead was limited in size to one half of an acre: " 'The homestead may include any quantity of land not exceeding 80 acres, and not included in the laid out or platted portion of any city. *If it be within the laid out or platted portion of such place its area shall not exceed one half of an acre.'* " *Id.* at 1003 (quoting Minn.Stat. Ann § 510.02 (West Supp. 1982)) (emphasis added by the court). Although under Minnesota law the debtor had a right to select an exempt one half acre so that levy could be made on the remainder, in *O'Brien,* the debtor requested that the entire lot be sold. *Id.* The debtor then argued that because the non-exempt portion of the property was "virtually worthless," he should be entitled to keep the entire proceeds of the sale. The Eighth Circuit held otherwise, finding that the bankruptcy court correctly made an apportionment of the proceeds from the sale based on the debtor's allowed exempt and non-exempt property. On its face, the case is distinguishable in relation to one fact in particular—in *O'Brien,* the debtor

requested that the property be sold; in the present case, Debtors have not requested that the property be sold, and object to the sale of the property.

Two other cases cited by the parties interpreted their respective states' constitution and statutes, which limit the value of a debtor's homestead exemption. *In re Evans,* 51 B.R. 47, 50 (Bankr.D.Vt.1985) (interpreting Vermont statutes); *In re Hughes,* 244 B.R. 805 (Bankr.D.S.D.1999) (interpreting South Dakota constitution). No such provision exists under Arkansas law.

Under the Arkansas constitution, a debtor has the right to exempt up to

one acre of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of two thousand five hundred dollars, and in no event shall such homestead be reduced to less than one-quarter of an acre of land, without regard to value.

Ark. Const., art. 9, § 5. The only exception to the homestead exemption is specifically enumerated in the above provision: "and in no event shall such homestead be reduced to less than one-quarter acre of land, without regard to value." In other words, there is no cap on the dollar amount of a homestead in Arkansas provided the homestead does not exceed one quarter acre.

The Arkansas constitution is similar to the Florida constitution. Florida provides for a homestead exemption as follows:

Homesteads—exemptions

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon ... the following property owned by a natural person:

(1) a homestead, if located outside a municipality, to the extent of one hundred

sixty acres of contiguous land and improvements thereon ...; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or his family. ...

Fla. Const. art. X, § 4(a)(1). There are no limitations on the cost, size, or construction of the residence. *Englander v. Mills (In re Englander)*, 95 F.3d 1028, 1031 (11th Cir.1996). In two separate opinions interpreting Florida law, the Eleventh Circuit found that the bankruptcy court could order the trustee to sell homestead property that could not be divided because of zoning laws or subdivision regulations, and that exceeded one half an acre. *Kellogg v. Schreiber (In re Kellogg)*, 197 F.3d 1116 (11th Cir.1999), *Englander v. Mills (In re Englander)*, 95 F.3d 1028 (11th Cir.1996). The bankruptcy court would then allocate the proceeds to the property owner in the amount of his exemption, and to the trustee.

In the earlier case, *In re Englander*, the debtors owned 1.05 acres located in Winter Park, Florida. The parties agreed that the property could not be subdivided because of local zoning and building regulations. The debtors designated one half acre as exempt property pursuant to Florida law, and the other one half acre non-exempt. The debtors' selected non-exempt property had no access to roads, utilities, or lake frontage, and was surrounded by the claimed exempt property. *Englander*, 95 F.3d at 1030. The bankruptcy court granted the trustee's motion for summary judgment, and gave the debtors "an exemption in a portion of the proceeds to be derived from the sale of the property." *Id.* The debtors appealed the court's decision. The issue before the Eleventh Circuit was "whether the bankruptcy court can order the sale of a claimed homestead property, which ex-

ceeds the area limitation under the homestead provision and cannot be practically or legally subdivided, and then order an apportionment of the proceeds." *Id.* In this case of first impression for the Eleventh Circuit, the court reviewed the existing law in Florida and found that a majority of Florida bankruptcy courts have allowed the trustee to sell indivisible property. The court would then apportion the proceeds. The court also cited to the *In re Evans* and *O'Brien v. Heggen* cases for the proposition that sale and apportionment is a solution that allows "an appropriate recognition of the debtor's homestead exemption and yet afford[s] the creditors some satisfaction of their rightful claims." *Id.* at 1032. The Eleventh Circuit held that because the claimed homestead exemption was indivisible and exceeded the limitation on area set by the Florida constitution, sale and apportionment of the proceeds was an equitable solution.

In the later case, *In re Kellogg*, the court was presented with the same issue. The debtor claimed a homestead exemption in approximately 1.3 indivisible acres located in Palm Beach, Florida. Palm Beach zoning laws required a minimum parcel size of 60,000 square feet (approximately 1.37 acres); therefore, the debtor could not legally subdivide the property. Because of this, the bankruptcy court ruled that the property must be sold and the proceeds apportioned between the debtor and the bankruptcy estate. *Kellogg*, 197 F.3d at 1118–19. The Eleventh Circuit found that separating the debtor's property into exempt and non-exempt parcels was equivalent to subdividing the property, which could not be done lawfully without a variance. By turning over the non-exempt property to the trustee for disposition, the debtor would be exposing neighboring landowners "to precisely the

same evils the zoning laws are intended to prevent...." *Id.* at 1120. The Eleventh Circuit affirmed the decision of the bankruptcy court to direct a sale of the property and allocate the proceeds equitably. *Id.* at 1121.

In the present case, Debtors' property is located in Har–Ber Meadows subdivision, a PUD located in Springdale, Arkansas. Debtors' home is located on an estate lot, upon which only a single family residence is allowed. According to the covenants of Har–Ber Meadows subdivision, a lot cannot be split, divided, or replatted without express written approval. Further, the city of Springdale does not permit a waiver or variance from the zoning requirements imposed on Har–Ber Meadows subdivision because the final plat has already been approved. According to Patsy Christie, Planning and Community Development Director for the city of Springdale, the only way to detach the subject property from the PUD zoning requirements is to de-annex the property from the subdivision and seek to have it re-zoned.

Debtors bought a problem when they bought the residence in Har–Ber Meadows subdivision. Bradley testified that he knew at the time he purchased the Har–Ber Meadows property that it contained more than one quarter acre, and was subject to certain covenants. He also knew that under Arkansas law he could only claim one quarter acre as exempt.

This is a case of first impression in this Court and under Arkansas law. In this case, it is clear that the Har–Ber Meadow subdivision covenants and the city of Springdale building ordinances do not allow the subject property to be divided. After reviewing the Arkansas constitution and Florida constitution, which are similar, this Court will follow the holding of the Eleventh Circuit Court of Appeals that allows the trustee to sell the subject prop-erty and the court to allocate the proceeds according to each parties' interest. After the property has been sold, the Court will hold a subsequent valuation hearing to determine the amount to which Debtors are entitled under their homestead exemption.

For the reasons stated above, the Court overrules the Trustee's objections to homestead exemption and objections to amended exemptions that relate to Debtors' alleged fraudulent transfer of property, limiting the value of the homestead exemption to $2500.00, and the carve out of one quarter acre; and sustains the Trustee's objections to exemptions and objections to amended exemptions that relate to the sale of the subject property. The Trustee is ordered to sell the subject property and hold the proceeds in trust pending a hearing in this Court to determine the appropriate allocation of the proceeds.

IT IS SO ORDERED.